## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------x
In re:                                          :    Chapter 11
                                                :
    COMCAR INDUSTRIES, INC., *et al.*,[1]    :    Case No. 20-11120 (LSS)
                                                :
    Debtors.                                :    (Joint Administration Requested)
----------------------------------------------------------------x

### MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER
### (I) AUTHORIZING THE PRIVATE SALE OF CERTAIN ASSETS FREE AND
### CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS,
### (II) AUTHORIZING THE SELLERS TO ASSUME AND ASSIGN CERTAIN
### EXECUTORY CONTRACTS, (III) APPROVING BIDDER PROTECTIONS,
### AND (IV) GRANTING OTHER RELATED RELIEF

Comcar Industries, Inc. and its affiliated debtors (collectively, the "Debtors"), by and

through their proposed counsel, DLA Piper LLP (US), hereby submit this motion (the "Motion")

for entry of an order ("Sale Order"), substantially in the form attached hereto as **Exhibit A**, seeking

relief under sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code"), rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i)

authorizing the Debtors to enter into and consummate that certain Asset Purchase Agreement (the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: 9th Place Newberry, LLC (0359); 16th Street Pompano Beach, LLC (0278); CCC Spotting, LLC (0342); CCC Transportation, LLC (1058); Charlotte Avenue Auburndale, LLC (2179); Coastal Transport, Inc. (2918); Coastal Transport Logistics, LLC (7544); Comcar Industries, Inc. (8221); Comcar Logistics, LLC (2338); Comcar Properties, Inc. (9545); Commercial Carrier Corporation (8582); Commercial Carrier Logistics, LLC (7544); Commercial Truck and Trailer Sales Inc. (0722); Cortez Blvd. Brooksville, LLC (2210); CT Transportation, LLC (0997); CTL Distribution, Inc. (7383); CTL Distribution Logistics, LLC (7506); CTL Transportation, LLC (0782); CTTS Leasing, LLC (7466); Detsco Terminals, Inc. (9958); Driver Services, Inc. (3846); East Broadway Tampa, LLC (2233); East Columbus Drive Tampa, LLC (3995); Fleet Maintenance Services, LLC (1410); MCT Transportation, LLC (0939); Midwest Coast Logistics, LLC (7411); Midwest Coast Transport, Inc. (0045); New Kings Road Jacksonville, LLC (4797); Old Winter Haven Road Auburndale, LLC (4738); W. Airport Blvd. Sanford, LLC (0462); Willis Shaw Logistics, LLC (7341); WSE Transportation, LLC. The corporate headquarters and the mailing address for the Debtors listed above is 8800 Baymeadows Way West, Suite 200, Jacksonville, Florida 32256.

"Purchase Agreement")[2], by and between Comcar Industries, Inc., MCT Transportation, LLC ("MCT" or the "Company"), and certain of their subsidiaries and affiliates (collectively, the "Sellers") and White Willow Holdings, LLC and its designee (the "Purchaser") for the private going concern sale of substantially all of the assets (the "Acquired Assets") of MCT, (ii) authorizing the Sellers to assume certain executory contracts and unexpired leases (the "Assumed Contracts"), and to assign the Assumed Contracts to the Purchaser pursuant to the Purchase Agreement and the Sale Order; (iii) authorizing the Sellers to sell or lease the real property used in connection with the operation of the Sellers' business; and (iv) granting related relief.  In support of this Motion, the Debtors submit the Declarations of Billy Hart and Andrew Hinkelman, attached hereto as **Exhibit B** and **Exhibit C**, respectively.  In further support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Prior to the Petition Date, the Debtors began to explore strategic transaction to recapitalize or restructure the business.  To that end, in March 2020, the Debtors engaged Bluejay Advisors, LLC ("Bluejay") as investment banker to advise the Debtors with respect to strategic alternatives.  As part of this process, Bluejay prepared confidential information memoranda for each of the Debtors' business segments and conducted a marketing process.  Despite the Debtors' efforts in the marketing process, the Debtors only received one indication of interest and offer of value from the Purchaser.  Accordingly, in April 2020, the Debtors engaged in negotiations and a diligence process with the Purchaser for the purchase of the Acquired Assets.  As a result of substantial arms'–length, good faith negotiations between the Purchaser and the Debtors, the

---

[2]      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

Purchaser agreed to purchase the Acquired Assets and assume the Assumed Contracts for the Purchase Price (as defined below). Finally, the negotiations also resulted in a transaction structure that could close promptly on terms favorable to the Debtors.

2.    As of the Petition Date, the Debtors are aware of one or two other parties that might express interest in the Acquired Assets, however, to date any such interest would not be accretive to the estates. While the Acquired Assets could be put up for auction, the terms offered by the Purchaser are materially superior to the net terms that the Debtors could hope to achieve at an auction. The Debtors believe that the costs of continuing to run the MCT business postpetition, including retaining all of the employees, during the extended period that a two-step marketing and sale process likely will entail may be detrimental to the going concern enterprise value of the MCT business and, therefore, seek to pursue Court approval of the transaction as a private transaction, not subject to postpetition marketing and auction, but subject to a fiduciary out should another party submit a higher or otherwise better offer.

3.    Given that (a) the Purchaser can consummate the private sale transaction sooner than if the Debtors subjected the Acquired Assets to an auction, (b) thus far, there are no other acceptable offers for the Acquired Assets, and (c) nothing in the Purchase Agreement prohibits the Debtors from consummating any alternative transaction that, in the Debtors' business judgement will maximize the value of their estates[3] (subject to the Break-Up Fee, defined below), the Debtors in their business judgment have determined that it is unlikely an auction will lead to a higher or otherwise better bid for the Acquired Assets. Accordingly, the Debtors seek to sell the Acquired

---

[3]    The Debtors reserve the right to exercise their fiduciary duties and terminate the Purchase Agreement should another party submit a bona fide binding offer and good faith deposit to purchase the Acquired Assets for higher or otherwise better consideration. Further, the Debtors seek authority to lease or sell real estate in which they hold an interest related to the operations of MCT's business should any alternative offer include the real estate as an Acquired Asset or any such lease as an Assumed Contract.

Assets and assign the Assumed Contracts to the Purchaser, pursuant to a private sale, free and clear of all liens, claims, encumbrances and other interests.

4.    For these reasons, and as set forth more fully below, the relief sought by this Motion should be granted.

## JURISDICTION AND VENUE

5.    The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these chapter 11 cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.    Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.    Venue of these chapter 11 cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

8.    The statutory bases for the relief requested in this Motion are sections 105, 363 and 365 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules, and Local Rule 6004-1(b)

## BACKGROUND

9.    On the date hereof (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing its case (collectively, the "Chapter 11 Cases").

10.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' Chapter 11 Cases.  No date has been set for a meeting of creditors pursuant to section 341 of the Bankruptcy Code.

11.     Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Andrew Hinkelman in Support of Chapter 11 Filings and First Day Pleadings* [D.I. 22] (the "First Day Declaration"), filed with this Court on the Petition Date, which is fully incorporated into this Motion by reference.

12.     Mark Bostick ("Bostick"), the former owner of Comcar Industries, Inc., holds a right of first offer (the "ROFO") pursuant to that certain Shareholders Agreement, dated as of November 16, 2016.

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek entry of the proposed Sale Order, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 6004, and Local Rule 6004-1(b), (a) approving the private sale of the Acquired Assets and assignment of the Assumed Contracts to the Purchaser for cash consideration equal to the Purchase Price, as set forth in the Purchase Agreement, (b) authorizing the Sellers to assume the Assumed Contracts, and to assign the Assumed Contracts to the Purchaser pursuant to the Purchase Agreement, (c) authorizing the Sellers to sell or lease the real property used in connection with the operation of the Sellers' businesses, and (d) granting other related relief.

**BASIS FOR RELIEF**

## I.   THE PRIVATE SALE IS WARRANTED UNDER THE BANKRUPTCY CODE AND LOCAL RULES

**A.    The Purchase Agreement is Typical, Customary, and Reasonable, and Entering into the Purchase Agreement is an Exercise of the Debtors' Business Judgment.**

14.    The Debtors believe that the terms of the Purchase Agreement are typical, customary and reasonable under the circumstances, and should be entered into in the exercise of the Debtors' business judgment.

15.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property may be by private sale or public auction.  The paramount goal of either process is to maximize the proceeds of such sale and the recovery for the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor "had a fiduciary duty to protect and maximize the estate's assets."); *see also CFTC v. Weintraub*, 471 U.S. 343, 352 (1985) (same); *Cadle Co. v. Mims* (*In re Moore*), 608 F.3d 253, 263 (5th Cir. 2010) (same).

16.    In accordance with Local Rule 6004-1, the Purchase Agreement, in summary, sets forth the following terms:[4]

   a.    <u>Sale of the Acquired Assets</u>.  The Debtors are seeking approval for the sale of the Acquired Assets to the Purchaser by private sale for the purchase price of $2,254,500 million (the "<u>Purchase Price</u>"), and upon the terms and conditions set forth in the Purchase Agreement.  Upon execution of the Purchase Agreement, the Purchaser shall make an initial deposit of $250,000 (the "<u>Deposit</u>") into an escrow account designated by the parties.  Upon the closing of the sale of the Acquired Assets (the "<u>Closing</u>"), the Deposit shall continue to be held in the escrow account for a period of fourteen (14) days (the "<u>Holdback Period</u>").  The Deposit shall be released in the following manner at the end of the Holdback Period:

   (i)    During the Holdback Period, Purchaser shall make commercially reasonable efforts to locate certain vehicles and equipment (the "<u>Holdback Equipment</u>"), and Seller shall be permitted to make efforts to locate such Holdback

---

[4]    This summary is qualified in its entirety by reference to the provisions of the Purchase Agreement.  In the event of any inconsistencies between this summary and the Purchase Agreement, the terms of the Purchase Agreement shall govern.

Equipment as well.  Further, Sellers shall make good faith efforts to have all Holdback Equipment not delivered to Purchaser at Closing delivered to Purchaser. The Parties have agreed on the value (the "<u>Holdback Value</u>") of each item of the Holdback Equipment.

(ii)    Upon the expiration of the Holdback Period, Purchaser shall promptly deliver a status report to Sellers indicating (i) the missing Holdback Equipment, if any, and (ii) if the number of Drivers hired or contracted by Purchaser during the Holdback Period is less than 211 Drivers, the difference between 211 and the number of Drivers hired or contracted by Purchaser during the Holdback Period (such difference referred to herein as the "<u>Driver Deficiency</u>").

(iii)    Upon delivery of such status report, the following amount shall be released to Purchaser from the Deposit: the lesser of (i) the Deposit, and (ii) the Holdback Value of the missing Holdback Equipment plus the product of $5,000 and the Driver Deficiency.

In addition, the Purchaser shall deliver a complete schedule of the identified and delivered rolling stock, and the retained company drivers and owner operators, and a true-up of the funds released to Seller for each of the above. In the event that the Deposit has not been fully released to the Debtors, any remaining amount shall be released to the Purchaser.

b.    <u>Free of Any and All Encumbrances</u>.  The sale will be free and clear of all claims, liens, encumbrances and interests with all such liens to attach to the net cash proceeds of the sale of the Acquired Assets in the order of their priority and to the extent and validity as of immediately prior to such sale.

c.    <u>Acquired Assets</u>.  The Acquired Assets include: : (i) the Assumed Contracts; (ii) all Acquired Business Information; (iii) all goodwill associated with the Business, Assets, and Assumed Liabilities; (iv) all Vehicles owned by Sellers Relating to the Business; (v) all rights of Sellers to the Vehicles which are leased pursuant to an Assumed Contract; (vi) Sellers' owned equipment, machinery, furniture, shop equipment, spare parts, fixtures, furnishings, office equipment, computers, communications equipment, and other tangible personal property and improvements Relating to the Business; (vii) all rights of Sellers to the MCT Business equipment, machinery, furniture, spare parts, fixtures, furnishings, office equipment, communications equipment, and other tangible personal property and improvements, which are leased pursuant to an Assumed Contract; (viii) all rights of Sellers to the warranties, express or implied, and licenses received from manufacturers and sellers of the Equipment; (ix) all Claims and causes of action against any Person of every kind and description Relating to the Business,  and all Claims of any Seller to the extent arising from or relating to or in connection with the Acquired Assets or the Assumed Liabilities or Relating to the Business, all of the proceeds from the foregoing which are accrued and unpaid as of the Closing, all rights of indemnity, warranty rights, guaranties received from vendors, suppliers or manufacturers, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by any Seller against other Persons and the

prosecution files of Sellers related thereto, in each case, to the extent exclusively related to the Acquired Assets or the Assumed Liabilities; (x) all current assets Relating to the Business as of immediately prior to the Closing, except cash, cash equivalents and Accounts Receivable; (xi) all prepaid expenses of Sellers relating to any of the Assumed Contracts; and (xii) all Intellectual Property Rights solely Relating to the Business.

d.  <u>Excluded Assets</u>.  The private sale of the Acquired Assets excludes: (i) cash, cash equivalents and Accounts Receivable; (ii) Excluded Contracts; (iii) all Owned Real Property and any buildings, improvements and fixtures thereon and furniture threat; (iv) equity interests of Comcar's Subsidiaries and Affiliates; (v) any assets of Sellers not Relating to the Business; (vi) Avoidance Actions; (viii) any Claims of Sellers or their respective estates against any Seller or Subsidiary or Affiliate of any Seller, or any director, officer, Insider (as defined in Section 101 of the Bankruptcy Code), auditor, or accountant of the Sellers; (ix) any insurance policy covering acts and omissions of directors and officers of Sellers and any proceeds of such insurance policies; (x) workers' compensation insurance and related letters of credit, cash or other assets that serve as collateral with respect thereto, and all insurance policies, and all rights of any nature with respect to any such insurance policy, Relating to the Business or any of the Acquired Assets or Excluded Assets, including all rights to insurance proceeds to the extent Relating to the Business or any Acquired Asset or Excluded Asset and any insurance claims with respect to any Acquired Asset attributable to the pre-Closing period or Excluded Asset that is attributable to the pre-Closing period or the post-Closing period and any rights to assert claims seeking any such recoveries; (xi) all IT Systems that are owned by Sellers, or used by Sellers Relating to the Business; (xii) Personally Identifiable Information; (xiii) all Permits Relating to the Business; and (xiv) all escrow accounts, or other holdbacks, including lease and insurance payments, for all owner operators contracted with any Seller.

e.  <u>Transition Services Agreement</u>.  If reasonably required by Purchaser, Sellers, or its Subsidiaries or Affiliates, shall provide Purchaser, or cause to be provided, reasonable administrative services for up to 45 days following the Closing.  Such services shall be provided for a fee agreed by the Parties and subject to a transition services agreement with customary terms and conditions and negotiated by the Parties in good faith prior to Closing.

f.  <u>Cure Costs</u>.  The Purchaser shall pay any cure costs, as defined under section 365 of the Bankruptcy Code, if applicable, associated with any Service Contracts that the Purchaser designates to be Assumed Contracts.

g.  <u>Conditions to Closing</u>. The Purchase Agreement shall provide for usual and customary conditions precedent for transactions of this nature, including, but not limited to, receipt of third-party consents and approvals, and no material adverse change in the condition of the Company, or general market conditions.

h. <u>Consent to Jurisdiction</u>.  The Parties will be deemed to have consented to the jurisdiction of the United States Bankruptcy Court for the District of Delaware, and have waived any and all rights to a jury trial in connection with any and all disputes relating to, arising from, or connected with the purchase and sale of the Acquired Assets, and the construction or enforcement of the Purchase Agreement.

17.    In compliance with Local Rule 6004-1(b)(iv), the Debtors further state:

a. <u>Sale to Insider</u>. The Purchaser is not an insider of the Debtors, within the meaning of section 101(31) of the Bankruptcy Code.

b. <u>Agreements with Management</u>. The Purchaser may seek to enter into customary employment agreements with certain key employees.

c. <u>Releases</u>. The Purchase Agreement does not provide for any releases.

d. <u>Private Sale/No Competitive Bidding and Protections for the Purchaser</u>.  The Debtors are seeking approval for a proposed sale of the Acquired Assets to the Purchaser by private sale free and clear of all liens, claims, encumbrances and other interests, and upon the terms and conditions set forth in the Purchase Agreement, subject to a fiduciary out in favor of the Debtors.  While the Purchase Agreement provides for and allows the consummation of an alternative transaction, if the Sellers terminate the Purchase Agreement in favor of a sale to a third party, the Purchaser is entitled to receive $67,635 (the "<u>Break-Up Fee</u>") plus the documented actual reasonable out-of-pocket costs and expenses incurred by the Purchaser with respect to the transaction contemplated by the Purchase agreement, not to exceed $65,000.

e. <u>Closing and Other Deadlines</u>.  The closing date of the private sale shall take place on or before the second Business Day after the satisfaction of all conditions precedent set forth in the Purchase Agreement.

f. <u>Good Faith Deposit</u>.  The Purchase Agreement requires the Purchase to fund a good faith deposit of $250,000.

g. <u>Interim Arrangements with the Purchaser</u>.  The Debtors do not have any interim management or other agreement with the Purchaser.

h. <u>Use of Proceeds</u>.  The Purchase Agreement does not address the use of proceeds generated by the sale.  All Liens will attach to the proceeds, which will be distributed pursuant to the Sale Order or further order of this Court.

i. <u>Tax Exemption</u>.  The Debtors are not seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

j. <u>Record Retention</u>.  The Debtors will retain, or have reasonable access to, all records necessary for the administration of these Chapter 11 Cases.

k.  <u>Sale of Avoidance Actions</u>.  The Debtors are not seeking to sell avoidance actions.

l.  <u>Requested Findings as to Successor Liability</u>.  The Debtors are seeking to sell the Acquired Assets free and clear of successor liability claims.

m.  <u>Sale Free and Clear of Unexpired Leases</u>.  The Debtors are not seeking to sell the Premises free and clear of any unexpired leasehold interests or other rights.

n.  <u>Credit Bid</u>.  The Purchase Agreement does not contemplate a right to credit bid, except that in the event there is an auction as a result of the Debtors' receipt of a higher or otherwise better offer, the Purchaser may credit bid the Break-Up Fee. None of the Prepetition ABL Agent, Prepetition Term Agent or DIP Agent has expressed any desire or intent to submit a credit bid for the Acquired Assets.

o.  <u>Relief from Bankruptcy Rule 6004(h)</u>.  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for the private sale.

18.    While the Debtors believe the Purchase Agreement is in final, agreed form, the Debtors request authorization to accept such modifications and edits to the Purchase Agreement that are not materially burdensome or harmful to the estates as may be submitted by and agreed upon between the Purchaser and the Debtors (in consultation with the Consultation Parties) in their discretion and the Debtors' business judgment without further order of the Court.

**B.    The Sale of the Acquired Assets is Appropriate Under Section 363(b)(1) of the Bankruptcy Code.**

19.    Prior to the Petition Date, the Debtors marketed MCT for sale.  The Debtors are seeking Court approval of the sale of the Acquired Assets including the protections afforded to the Purchaser in the event the Debtors consummate an alternative transaction.

20.    Bankruptcy Code section 363(b) governs transactions outside the ordinary course of business involving property of the debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b).

21.    The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business

justification for the proposed transaction. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513 (7th Cir. 1991)).

22.    Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 175–76 (adopting *Lionel* factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated business justification test set forth in *Lionel* and adding the "good faith" requirement).

23.    The Debtors do not have the liquidity to continue to operate the MCT business beyond the period contemplated by the DIP Approved Budget.  Once debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing. *See id.* at 656; *see also In re Promise Healthcare Group, LLC, et al.*, Case No. 18-12491 (CSS) [D.I. 770] (order approving

the private sale of the Debtors' certain Louisiana facilities upon the Debtors' showing they properly exercised their business judgment and set forth sound business justifications for pursuing such a private sale, having marketed the private sale and showing that the purchaser was the only bidder for the Louisiana facilities that could close a sale promptly on terms favorable to the Debtors); *In re Celadon Group, Inc., et al.*, Case No. 19-12606 (KBO) [D.I. 417, 418, and 766] (orders approving private sales of the Debtors' nonresidential real property upon the Debtors' showing they properly exercised their business judgment and set forth sound business justifications for pursuing such private sales, having marketed the private sales and showing that the purchasers were the only bidders that could close a sale promptly on terms favorable to the Debtors).

24.     It is well settled that the sale of assets outside of the ordinary course of business by means of a private sale can, and in appropriate cases should, be approved.  *See, e.g.*, *In re Bakalis,* 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the former Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion… to conduct public or private sales of estate property.") (internal quotations and citations omitted); *In re Dewey & LeBeouf,* Case No. 12-12321 (MG), 2012 WL 5386276, at *6 (Bankr. S.D.N.Y. Nov. 1, 2012) (authorizing private sale of art collection because the debtor established a good business reason to proceed by private sale); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship* (*In re Woodscape Ltd. P'ship*), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale… and there is no requirement that the sale be by public auction."); s*ee also In re Promise Healthcare Group, LLC, et al.*, Case No. 18-12491 (CSS) [D.I. 426, 770, and 778] (orders approving the private sale of the Debtors' Louisiana facilities and their St. Alexius facility outside the ordinary course of business).

25.     The Debtors delegated approval of sale transactions to the Restructuring Committee comprising an independent director.  The Restructuring Committee approved and authorized this sale transaction and to proceed to seek approval as a private sale with the embedded fiduciary out. Therefore, the Debtors, in their business judgment, and in consultation with Bluejay and their other advisors, believe that the sale of the Acquired Assets to the Purchaser under the process proposed represents the fair market value for the Acquired Assets under the Purchase Agreement and under the circumstances of these Chapter 11 Cases.  Furthermore, the Debtors believe, given that (a) the Purchaser can consummate the private sale transaction sooner than if the Debtors subjected the Acquired Assets to auction, (b) thus far, no other acceptable expressions of interest or bids have been received,  (c) nothing in the Purchase Agreement prohibits the Debtors from consummating any alternative transaction that in the Debtors' business judgement will maximize the value of their estates and (d) it is unlikely an auction will lead to a higher or otherwise better bid for the Acquired Assets.  Accordingly, the Debtors respectfully submit that the proposed private sale of the Acquired Assets to the Purchaser should be approved.

**C.     Any Sale Should be Approved Free and Clear of Liens, Interests and Encumbrances.**

26.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest or encumbrance in such property if, among other things:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

27.    Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

28.    The Debtors will serve notice of the Motion on the Office of the United States Trustee, counsel to the DIP Lender and the Prepetition Term Loan Lender, counsel to the Purchaser, counsel to the Prepetition ABL Agent, counsel to the DIP Agent and Prepetition Term Loan Agent, counsel for Mr. Bostick and Commercial Warehousing, Inc. and its affiliates, other parties having expressed an interest in the Acquired Assets, any official committee professionals when appointed, the counter-parties to the Assumed Contracts, and applicable taxing authorities.

29.    The Debtors expect to obtain the consent of the DIP Lender and the Prepetition Term Loan Lender such that section 363(f)(2) will apply.  The Debtors contend that no other party asserts or holds a valid, perfected lien on the Acquired Assets.  Accordingly, to the extent any party contends that it holds a valid lien on the Acquired Assets, such lien is subject to bona fide dispute, and the Debtors may sell the Acquired Assets free and clear of such purported lien, under section 363(f)(4) of the Bankruptcy Code, and adequately protect such asserted lien by having the asserted lien attach to the proceeds of the sale in the same priority and to the same extent and validity as such lien attached to the Acquired Assets.  Therefore, the Debtors request that the private sale be approved free and clear of all encumbrances and interests, with the proceeds being distributed pursuant to further Court order.

30.     As to Bostick's ROFO, the Debtors submit that the right was respected by the Debtors prepetition through their marketing of the Acquired Assets to Bostick and is preserved (a) by this Motion serving as notice of the proposed sale of the Acquired Assets and the terms thereof; (b) by virtue of setting a hearing on the Motion thirty (30) days or more; and (c) through the Debtors' preservation of a fiduciary out under the Purchase .  Additionally, the Debtors reserve their right to reject the ROFO as an executory contract pursuant to section 365 of the Bankruptcy Code.  *See In re CB Holding Corp.*, 448 B.R. 684, 689 (Bankr. D. Del. 2011); *In re Kellstrom Indus., Inc.*, 286 B.R. 833, 834–35 (Bankr. D. Del. 2002); *In re Coordinated Financial Planning Corp.*, 65 B.R. 711, 713 (9th Cir. BAP 1986); *In re Fleishman*, 138 B.R. 641, 646-47 (Bankr. D. Mass. 1992); *In re A.J. Lane & Co., Inc.*, 107 B.R. 435, 437 (Bankr. D. Mass. 1989); *In re Hardie*, 100 B.R. 284, 287 (Bankr. E.D.N.C. 1989); *In re G–N Partners*, 48 B.R. 462, 466 (Bankr. D. Minn. 1985); *In re Waldron*, 36 B.R. 633, 636–37 (Bankr. S.D. Fla. 1984), *rev'd on other grounds*, 785 F.2d 936 (11th Cir. 1986); *In re AbitibiBowater, Inc.*, 418 B.R. 815, 830–31 (Bankr. D. Del. 2009).

**D.     The Break-Up Fee Should Be Approved.**

31.     Courts have approved competitive bidding protections given to a purchaser under the "business judgment rule", and such arrangements are presumptively valid provided: (a) the debtors' decision to agree to a break-up fee is not tainted by bad faith or self-dealing; (b) the break-up fee does not hamper bidding; and (c) the amount of the break-up fee is reasonable. *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656-57 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993). Specifically, among other things, such provisions attract or retain a potentially successful offer. *Id.* at 662.

32.     The Break-Up Fee will be reasonable in relation to the size of the proposed sale and under the facts of this transaction, and will be no more than $67,635 plus the documented actual

reasonable out-of-pocket costs and expenses incurred by the Purchaser with respect to the transaction contemplated by the Purchase agreement, not to exceed $65,000.

33.     Further, the inclusion of a Break-Up Fee in the Purchase Agreement is a critical component to the sale, owing to the considerable effort being expended by the Purchaser to conduct diligence and finalize the sale on a short timeline.

34.     The Break-Up Fee will not hamper any other party's ability to offer a higher or better bid for the Acquired Assets.  Given the size of the Break-Up Fee relative to the total amount of consideration provided for the Acquired Assets, the Break-Up Fee will not be so large as to cause a "chilling effect" on other prospective purchaser's interest in the Acquired Assets.

35.     As the timely sale of the Acquired Assets is necessary to preserve its value, the Break-Up Fee constitutes an actual and necessary cost and expense of preserving Debtors' estates. Accordingly, the Break-Up Fee is appropriate.

**E.     The Sale is Proposed in Good Faith.**

36.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

37.     Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Abbotts Dairies of Penn., Inc.*, 788 F.2d at 147 (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.*), 724 F.2d 52, 55 (7th Cir. 1983)). *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of

finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

38.     While the Bankruptcy Code does not define "good faith", some courts have held that a good faith purchaser is one who "purchases the assets for value, in good faith, and without notice of adverse claims." *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988) (quoting *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore, the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.*), 764 F.3d 512, 521 (5th Cir. 2014).

39.     The private sale has been proposed in good faith.  The Purchase Agreement was the product of extensive good faith, arms'-length negotiations between the Debtors, on the one hand, and the Purchaser, on the other, and was negotiated with the active involvement of the Debtors' professionals.  The Debtors believe and submit that the sale of the Acquired Assets to the Purchaser pursuant to the terms and conditions of the Purchase Agreement is not the product of collusion or bad faith.  No evidence suggests that the Purchase Agreement is anything but the product of arm's length negotiations between the Debtors, the Purchaser, and their respective professional advisors.  In connection with approval of the proposed private sale, the Debtors request that the Court make a finding that the Purchaser is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

40.     Furthermore, the Debtor are unaware of any circumstances or facts that could be perceived as or that the Purchaser or any other party colluded.

**II.     THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS ARE WARRANTED UNDER SECTION 365 OF THE BANKRUPTCY CODE**

**A.     Assumption and Assignment of Certain Executory Contract are Within Debtors' Business Judgment.**

41.     Pursuant to the Purchase Agreement, the Sellers are required to assume the Assumed Contracts and the obligations thereunder, and to subsequently assign the Assumed Contracts to the Purchaser.  Section 365 of the Bankruptcy Code provides as follows:

(a)  Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

42.     Accordingly, section 365 authorizes the proposed assumption of the Assumed Contracts by Debtors.  The assumption of a contract by a debtor is subject to review under the business judgment standard. *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the contracts. *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of [the] issue of assumption or rejection will be a matter of business judgment").

43.     The business judgment rule shields a debtor's management from judicial second-guessing.  *Id.*; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").   Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision

the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, when applying the business judgment rule, courts show great deference to a debtor's decision to assume a contract. *See Summit Land Co. v. Allen (In re Summit Land Co.*), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume an executory contract "should be granted as a matter of course"). Thus, this Court should approve the assumption of the Assumed Contracts, if the Debtors are able to demonstrate a sound business justification for doing so. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

44.    As previously noted, the assumption of the Assumed Contracts is required so that they may be assigned to the Purchaser pursuant to the Purchase Agreement. The Debtors, with the assistance of their advisors, have carefully reviewed the economic benefits of assumption and assignment of the Assumed Contracts and believe that their decision to assume the Assumed Contracts in connection with seeking approval of the Purchase Agreement is within the Debtors' sound business judgment, as the assumption of the Assumed Contracts will permit the consummation of the private sale, thereby benefiting the Debtors and their estates, while avoiding any further liability under the Assumed Contracts. Accordingly, the Debtors believe that assuming the Assumed Contracts is in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

## B.    The Assumption Procedures

45.    In connection with the assumption and assignment of the Assumed Contracts, the Debtors propose the following procedures (collectively, the "Assumption Procedures").

a. <u>Notice of Potential Assumption and Assignment</u>.  No later than three (3) business days after service of the Motion, the Debtors shall serve a notice of potential assumption, assignment, or transfer of executory contracts and unexpired leases, substantially in the form attached to this Motion as **Exhibit D** (a "<u>Notice of Potential Assumption</u>"), on all parties to the Assumed Contracts.

b. <u>Objection Period</u>.  Each Notice of Potential Assumption shall provide for the cure amounts the Debtors believe must be paid to cure all defaults outstanding under the applicable Assumed Contracts, and any objections to the assumption and assignment of such <u>Assumed Contracts</u>, including to the cure amount (a "<u>Contract Objection</u>"), must be in writing, filed with the Court, and actually received by the Objection Notice Parties (as defined below) no later than fourteen (14) days before the hearing on the Motion as noted in each Notice of Potential Assumption (the "<u>Assumption Objection Deadline</u>").

c. <u>Objection Procedures</u>.  If a contract counterparty files a Contract Objection in a manner consistent with the requirements set forth above, and the Debtors and the contract counterparty are unable to consensually resolve the dispute prior to the hearing on the Motion, the amount to be paid or reserved with respect to such objection will be determined at the hearing.

d. <u>Notice of Assumption and Assignment</u>.  No later than five (5) calendar days prior to the hearing on the Motion, the Debtors shall serve a notice, substantially in the form attached to this Motion as **Exhibit E** (a "<u>Notice of Assumption and Assignment</u>"), identifying the Assumed Contracts, the executory contracts or unexpired leases that will be assumed and assigned to the Purchaser upon the Closing, subject to exclusion as specified below.

e. <u>Excluded Contracts</u>.  The Purchaser may determine to exclude any executory contract or unexpired lease at any time prior to five (5) Business Days prior to the hearing on the Motion, notwithstanding such executory contract or unexpired lease having been identified in a Notice of Potential Assumption or Notice of Assumption and Assignment.  The Debtors will notify any non-Debtor party or parties to an excluded contract or lease by written notice as soon as practicable after such determination, which may be after the hearing or the Closing Date.

**C.     The Purchaser can Demonstrate Adequate Assurance of Future Performance.**

46.     Section 365 of the Bankruptcy Code provides that the trustee may assign an executory contract or unexpired lease if (i) such contract or lease is assumed in accordance with the Bankruptcy Code and (ii) adequate assurance of future performance by the assignee is provided. 11 U.S.C. § 365(f)(2).

47.     The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d Cir. 2001); *see Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[A]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

48.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

## WAIVER OF BANKRUPTCY RULE 6004(h)

49.     The Debtors respectfully request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).  Timely consummation of the proposed sale is of critical importance to both the Debtors and the Purchaser, and is vital to the Debtors' efforts to maximize the value of the Debtors' estates.  Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## NOTICE

50.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) applicable Taxing Authorities; (d) counsel to the DIP Lender and the Prepetition Term Loan Lender; (e) counsel for the Purchaser; (f) counsel to the Prepetition ABL Agent; (g) counsel to the DIP Agent and the Prepetition Term Loan Agent; (h) the counterparties to the Assumed Contracts; (i) counsel for Bostick; (j) any official committee of professionals when appointed; (k) all parties that expressed interest in any of the Acquired Assets during Bluejay's prepetition marketing of the Acquired Assets; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no other or further notice of this Motion is required.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request that this Court (i) enter the proposed Sale Order, substantially in the form of attached hereto as **Exhibit A**, granting the relief requested in this Motion, and (ii) grant such other and further relief as this Court may deem just and proper.

Dated:  May 18, 2020
       Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@us.dlapiper.com

-and-

Jamila Justine Willis (*pro hac vice* admission pending)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
Email:  jamila.willis@us.dlapiper.com

*Proposed Counsel to the Debtors*