## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
In re:                                    :   Chapter 11
                                          :
        COMCAR INDUSTRIES, INC., et al.,¹  :   Case No. 20-11120(LSS)
                                          :
        Debtors.                          :   (Jointly Administered)
-----------------------------------------------------------x
```
Hearing Date: June 19, 2020 at 10:00 a.m.
prevailing Eastern time
Objection Deadline:  June 12, 2020 at 4:00 p.m.
prevailing Eastern time

### MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL OF THE ASSETS OF CCC TRANSPORTATION, LLC AND COMMERCIAL TRUCK AND TRAILER SALES, INC. FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) AUTHORIZING THE DEBTORS TO SELL CERTAIN REAL ESTATE AND IMPROVEMENTS THEREON LOCATED IN AUBURNDALE, FLORIDA; (III) AUTHORIZING THE DEBTORS TO TAKE ALL ACTIONS NECESSARY TO CONSUMMATE THE PRIVATE SALE; (IV) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS; (V) APPROVING BIDDER PROTECTIONS; (VI) APPROVING SETTLEMENT; AND (VII) <u>GRANTING RELATED RELIEF</u>

Comcar Industries, Inc. and its affiliated debtors (collectively, the "<u>Debtors</u>"), by and

through their proposed counsel, DLA Piper LLP (US), hereby submit this motion (the "<u>Motion</u>")

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: 9th Place Newberry, LLC (0359); 16th Street Pompano Beach, LLC (0278); CCC Spotting, LLC (0342); CCC Transportation, LLC (1058); Charlotte Avenue Auburndale, LLC (2179); Coastal Transport, Inc. (2918); Coastal Transport Logistics, LLC (7544); Comcar Industries, Inc. (8221); Comcar Logistics, LLC (2338); Comcar Properties, Inc. (9545); Commercial Carrier Corporation (8582); Commercial Carrier Logistics, LLC (7544); Commercial Truck and Trailer Sales Inc. (0722); Cortez Blvd. Brooksville, LLC (2210); CT Transportation, LLC (0997); CTL Distribution, Inc. (7383); CTL Distribution Logistics, LLC (7506); CTL Transportation, LLC (0782); CTTS Leasing, LLC (7466); Detsco Terminals, Inc. (9958); Driver Services, Inc. (3846); East Broadway Tampa, LLC (2233); East Columbus Drive Tampa, LLC (3995); Fleet Maintenance Services, LLC (1410); MCT Transportation, LLC (0939); Midwest Coast Logistics, LLC (7411); Midwest Coast Transport, Inc. (0045); New Kings Road Jacksonville, LLC (4797); Old Winter Haven Road Auburndale, LLC (4738); W. Airport Blvd. Sanford, LLC (0462); Willis Shaw Logistics, LLC (7341); WSE Transportation, LLC. The corporate headquarters and the mailing address for the Debtors listed above is 8800 Baymeadows Way West, Suite 200, Jacksonville, Florida 32256.

for entry of an order ("Sale Order")[2], seeking relief under sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing the Debtors to enter into a definitive Purchase Agreement (as defined below), which will include the material terms set forth in that certain Letter of Intent (the "Letter of Intent"),[3] dated May 17, 2020, by and among Debtors CCC Transportation, LLC ("CCC") and Commercial Truck and Trailer Sales, Inc. ("CTTS Repair" and together with CCC, the "Sellers"), and CWI Logistics, LLC ("Logistics" or the "Purchaser"), an affiliate of Commercial Warehousing, Inc. ("CWI"); (ii) authorizing the private going-concern sale of substantially all of the assets of or primarily used in the business of the Sellers (the "Acquired Assets"), subject to the Debtors' fiduciary duties; (iii) authorizing Comcar Industries, Inc. and certain relevant affiliated Debtors to sell, transfer and convey certain real estate located in Auburndale, FL, at and commonly known as (a) 502, 548 Bridgers Ave., and 509 U.S. 92, (b) Charlotte Ave., and (c) 306 Old Winter Haven Rd. (excluding real estate situated at SEC US Hwy 92 & Charlotte Rd. Auburndale, FL 33823, the 45-acre undeveled parcel) (collectively, the "Real Estate"); (iv) authorizing the Debtors to take all actions necessary to consummate the transactions contemplated by the Purchase Agreement and related documents and agreements required to be executed with the closing of the sale transaction (collectively, the "Definitive Documents"); (v) authorizing the Debtors to assume certain executory contracts, unexpired leases,

---

[2]     Definitive Documents (as defined below) and a proposed Sale Order will be filed with the Court at least seven (7) days prior to the hearing on the Motion.

[3]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Letter of Intent.

and governmental operating authorities and permits (the "Assumed Contracts"), and to assign the Assumed Contracts to the Purchaser pursuant to the Purchase Agreement and the Sale Order; (vi) authorizing the Debtors to settle claims by and against the Debtors and grant the releases contemplated in the Letter of Intent and to be documented among the parties; (vii) authorizing the Debtors to accept the grant of interests in certain vehicles from CWI; and (viii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.     CCC transports concrete and related materials.  CCC historically has not operated on a cash-flow-positive basis and has been negatively impacted by the current COVID-19 pandemic and stay-at-home orders.  CTTS was originally incorporated in Tampa, Florida in 1963 to purchase equipment for the Company's fleet.  CTTS Repair has evolved into a respected supplier of parts and repairs in the Central Florida transportation industry.  Currently, CTTS Repair buys and sells parts and performs repairs from three locations: Tampa, Florida, Orlando, Florida, and Auburndale, Florida.

2.     CWI is majority owned by Mark Bostick ("Bostick").  Bostick and CWI collectively own less than 10% of the equity of Comcar.  At least until several weeks before the Petition Date when he resigned his position, Bostick was technically an insider of Comcar as a minority member of its Board of Directors.  Bostick has been in litigation with Comcar since 2018.

3.     CWI is a party to an equipment lease covering in excess of 500 trailers operated by the Debtors ("CWI Equipment Lease").  Prior to the Petition Date, CWI and Bostick commenced arbitration proceedings against the Debtors and their majority shareholder and senior secured term loan lender.  The claims asserted generally sounded in lack of good faith and related claims arising out of a right of first opportunity granted in the shareholders' agreement.  After lengthy and costly

arbitration proceedings, the arbitrators awarded liability to the plaintiffs and ordered a contractually required payment of $500,000 related to the removal of Bostick as Chairman of the Board of Directors, but awarded no damages in relation to the claims asserted relating to exercise of the option. The arbitration award is the subject of an appeal pending as of the Petition Date. CWI also has other claims against the Debtors based on real estate and equipment leases and other transactions, to which the Debtors would assert defenses. The Debtors also have other claims or causes of action against Bostick or CWI, including potential avoidance actions, to which Bostick and CWI would assert defenses.

4.      Prior to the Petition Date, the Debtors began to explore strategic transactions to recapitalize or restructure the business. To that end, in March 2020, the Debtors engaged Bluejay Advisors, LLC ("Bluejay") as investment banker to advise the Debtors with respect to strategic alternatives. As part of this process, Bluejay prepared confidential information memoranda for each of the Debtors' business segments and conducted a marketing process. Despite the Debtors' efforts in the marketing process, the Debtors only received two indications of interest and offers of value. However, one of the parties lowered their offer and sought to impose closing expenses on the Debtors that rendered the offer unacceptable. Nevertheless, the Debtors engaged in negotiations and a diligence process with both parties right up to the Petition Date. The Letter of Intent contemplates that the trailers primarily used in the CCC business under the CWI Equipment Lease would transfer to the Purchaser and CWI's right, title, and interest in and to the trailers leased to Debtors by CWI and used in the business of Debtor CTL Transportation, LLC ("CTL") would be transferred to Debtors free and clear as partial consideration for the transactions contemplated by the Letter of Intent. The trailers leased to Debtors by CWI and used in the CTL

business are to be sold in connection with the motion to sell substantially all of the assets of CTL (the "CTL Sale") [D.I. 24].

5.    As a result of substantial arms'-length, good faith negotiations between the Purchaser, Bostick, CWI, and the Debtors, the Purchaser submitted the Letter of Intent.

6.    The releases contemplated by the Letter of Intent release (a) any claims the Debtors may have against Bostick to avoid and recover the $500,000 payment made in respect of the arbitration award, (b) the Bostick arbitration claim (in which damages of over $20 million were asserted), and related litigation, and (c) certain other CWI claims related to past-due real estate and equipment lease payments, loans, trailer rent, and other charges, all subject to the terms and conditions set forth in the Letter of Intent and to be set forth in the Definitive Documentation.  As the result of the foregoing concessions and agreements by CWI and the Purchaser, the negotiations resulted in a transaction structure that could close promptly on terms favorable to the Debtors and allow the CTL transaction to close promptly on favorable terms as well, subject to contemporaneous closing of the transaction contemplated hereby.

7.    Without the Letter of Intent having been executed, the Debtors would have determined to cease the operations of CCC on or prior to the Petition Date – resulting in the loss of going-concern value and accrual of costs and claims related to the shutdown of CCC.  The closing of the transactions contemplated by the Letter of Intent would eliminate any risk that the Debtors might not be able to promptly transfer title to the CWI trailers to CTL, and resolve claims against the Debtors that might otherwise require litigation and the incurrence of administrative claims in the way of defense costs.  The Debtors do not think that there is any other viable transaction to keep CCC and CTTS Repair operating as going concerns and their employees and independent contractors employed, and there is certainly no other transaction that can deliver the

unique settlement benefits to be received from CWI.  The Debtors believe that a private sale will be beneficial to the Debtors' estates, given the costs of continuing to run the CCC and CTTS Repair businesses postpetition, including retaining all of the employees and the benefits to be conferred on the estates as a result of the terms of the Letter of Intent.  Therefore, the Debtors seek to pursue Court approval of the transaction as a private transaction, not subject to postpetition marketing and auction, but subject to a fiduciary out should another party submit a higher or otherwise better offer, taking into account the unique and valuable consideration that is being gained by the Debtors as a result of the settlement features of the Letter of Intent.

8.       Given that (a) the Purchaser would be able to consummate the private sale transaction sooner than if the Debtors subjected the Acquired Assets to an auction, (b) thus far, there are no other acceptable offers for the Acquired Assets, (c) the Letter of Intent also constitutes a settlement of claims that are the subject of pending and threatened litigation to which the Debtors and the Purchaser, and their respective affiliates are party, and would release substantially all other claims, and (d) nothing in the Letter of Intent prohibits the Debtors from consummating any alternative transaction that, in the Debtors' business judgement will maximize the value of their estates[4] (subject to the Break-Up Fee, defined below), the Debtors in their business judgment have determined that it is unlikely an auction will lead to a higher or otherwise better bid for the Acquired Assets.  Accordingly, the Debtors seek to enter into the Definitive Documents, pursuant to the terms of the Letter of Intent, and sell the Acquired Assets and assign the Assumed Contracts to the Purchaser, pursuant to a private sale, free and clear of all liens, claims, encumbrances and other interests.

---

[4]       The Debtors reserve the right to exercise their fiduciary duties and terminate consummating a sale with the Purchaser should another qualified party submit a bona fide binding offer and good faith deposit to purchase the Acquired Assets for higher or otherwise better consideration.

9.      For these reasons, and as set forth more fully below, the relief sought by this Motion should be granted.

## JURISDICTION AND VENUE

10.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these chapter 11 cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

11.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.      Venue of these chapter 11 cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

13.      The statutory bases for the relief requested in this Motion are sections 105, 363 and 365 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules, and Local Rule 6004-1(b)

## BACKGROUND

14.      On May 17, 2020 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing its case (collectively, the "Chapter 11 Cases").

15.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or official committee of unsecured creditors has been appointed

in the Debtors' Chapter 11 Cases.  No date has been set for a meeting of creditors pursuant to section 341 of the Bankruptcy Code.

16.    Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Andrew Hinkelman in Support of Chapter 11 Filings and First Day Pleadings* [D.I. 22] (the "<u>First Day Declaration</u>"), filed with this Court on the Petition Date, which is fully incorporated into this Motion by reference.

## <u>RELIEF REQUESTED</u>

17.    By this Motion, the Debtors seek entry of the proposed Sale Order, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019, and Local Rule 6004-1(b), (a) authorizing the Debtors to enter into and consummate the Purchase Agreement that will include the material terms set forth in the Letter of Intent; (b) approving the private sale of the Acquired Assets and assignment of the Assumed Contracts to the Purchaser for consideration equal to the Purchase Price, as set forth in the Letter of Intent, subject to the Debtors' fiduciary out; (c) authorizing the Debtors to sell, transfer and convey the Real Estate free and clear of claims, liens, encumbrances and the interest of others; (d) settle claims and exchange the contemplated releases; (e) take all actions necessary to consummate the transactions contemplated by the Definitive Documents; (f) authorizing the Debtors to assume the Assumed Contracts, and to assign the Assumed Contracts to the Purchaser pursuant to the Purchase Agreement; and (g) granting other related relief.

## BASIS FOR RELIEF

**I.    THE PRIVATE SALE IS WARRANTED UNDER THE BANKRUPTCY CODE AND LOCAL RULES**

**A.    The Definitive Documents will be Consistent with the Letter of Intent.**

18.    Local Rule 6004-1(b)(1) states that sale motions shall attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale." The Debtors have attached the Letter of Intent as **Exhibit A** hereto, and believe that the Letter of Intent contains substantially all of the material terms that will be included in the Purchase Agreement. Accordingly, the Debtors respectfully request that this Court approve the private sale on the terms to be set forth in the Definitive Documents, which shall be filed with the Court no later than seven (7) business days prior to the hearing on this Motion, in accordance with the Local Rule 6004-1.

**B.    The Terms of the Letter of Intent are, and the Terms of the Purchase Agreement Will be, Typical and Reasonable and Entering into the Purchase Agreement is an Exercise of the Debtors' Business Judgment.**

19.    The Debtors believe that the terms of the Letter of Intent are, and that the terms of the Purchase Agreement will be, typical and reasonable under the circumstances, and the Purchase Agreement should be entered into in the exercise of the Debtors' business judgment.

20.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property may be by private sale or public auction. The paramount goal of either process is to maximize the proceeds of such sale and the recovery for the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor "had a fiduciary duty to protect and maximize the estate's assets."); *see also CFTC v. Weintraub*, 471 U.S. 343, 352 (1985) (same); *Cadle Co. v. Mims* (*In re Moore*), 608 F.3d 253, 263 (5th Cir. 2010) (same).

21.     In accordance with Local Rule 6004-1, the Letter of Intent, in summary, sets forth the following terms, which shall also be the terms of the Purchase Agreement:[5]

a.   <u>Sale of the Acquired Assets</u>.  The Debtors are seeking approval for the sale of the Acquired Assets to the Purchaser by private sale for the Consideration to the Debtors, and upon the terms and conditions set forth in the Letter of Intent.

b.   <u>Consideration to the Debtors</u>.  In exchange for the Acquired Assets, the Purchaser will (i) transfer all of CWI's right, title, and interest in and to the trailers leased to Comcar by CWI and used in the CTL business, (ii) assume of all monthly lease obligations for periods after closing under Comcar's lease of the Assumed Tractors and Rental Tractors, or the leases for such tractors shall be designated by Purchaser as leases to be rejected by Comcar, and (iii) commit  to offer comparable employment to a substantial number of the employees of CCC and CTTS and certain agreed-upon employees of Comcar situated in Auburndale, with a view of avoiding WARN Act notification requirements and effecting a reduction of Comcar's liability for severance, and other payroll related to employees to whom Purchaser offers employment.

c.   <u>Free of Any and All Encumbrances</u>.  The sale will be free and clear of all claims, liens, encumbrances and interests, with all such liens to attach to the net proceeds of the sale of the Acquired Assets in the order of their priority and to the extent of their validity as of immediately prior to such sale.

d.   <u>Acquired Assets</u>.  The Acquired Assets include the business and operating assets of or primarily used in the business of CCC, including without limitation, (A) assumption of the CWI Equipment Lease pertaining only to the CWI/CCC Trailers leased from CWI and used in CCC's business, and no other trailers, (B) the right to negotiate ongoing leases of any or all of (1) approximately 34 day cab and sleeper tractors (but no spotters) used in CCC's business under non-month-to-month leases (the "<u>Assumed Tractors</u>"), and (2) the month-to-month leased tractors (the "<u>Rental Tractors</u>"), in each case on terms to be negotiated with the lessor thereof (actual number to depend on the number of drivers who qualify for employment with Purchaser once the applicable records are available for diligence and the willingness of lessors to enter into new or assigned lease agreements on acceptable terms), and (C) the other miscellaneous assets used in the business, including without limitation, parts, tools, inventory, intangibles (customer lists and information, phone and fax numbers, websites, goodwill, URLs, employee and independent contractor files and contracts, and all other IP), and FF&E, but not accounts receivable or other working capital assets ("<u>Miscellaneous Assets</u>"); (D) the business and operating assets of or primarily used in the business of CTTS as conducted from its three locations, including without limitation its Miscellaneous Assets; and (E) three parcels of Auburndale Real Estate owned by the Debtors,

---

[5]     This summary is qualified in its entirety by reference to the provisions of the Letter of Intent.  In the event of any inconsistencies between this summary and the Letter of Intent, the terms of the Letter of Intent shall govern.

commonly known as (1) 502, 548 Bridgers Ave., and 509 U.S. 92, (2) Charlotte Ave., and (3) 306 Old Winter Haven Rd. (excluding the real estate situated at SEC US Hwy 92 & Charlotte Rd. Auburndale, FL 33823, the 45-acre undeveloped parcel).

e. <u>Excluded Assets</u>.  The private sale of the Acquired Assets excludes substantially all working capital assets.

f. <u>Cure Costs</u>.  The Purchaser shall pay any cure costs, as defined under section 365 of the Bankruptcy Code, if applicable, associated with any Assumed Contracts.

g. <u>Conditions to Closing</u>.  The Purchase Agreement shall provide for usual and customary conditions precedent for transactions of this nature, including, but not limited to, receipt of third-party consents and approvals.  Such conditions shall also include (1) the Releases (described below), (2) the sale of CTL provided that Debtors receive gross proceeds of at least $9,000,000 (or such lesser amount as Debtors may approve in their sole discretion), which condition is waivable by Debtors in their sole discretion.

h. <u>Indemnification</u>.  The Letter of Intent does not provide for indemnification rights of either party to be provided in the Purchase Agreement.

i. <u>Consent to Jurisdiction</u>.  The Parties will be deemed to have consented to the jurisdiction of the United States Bankruptcy Court for the District of Delaware, and have waived any and all rights to a jury trial in connection with any and all disputes relating to, arising from, or connected with the purchase and sale of the Acquired Assets, and the construction or enforcement of the Purchase Agreement.

22.    In compliance with Local Rule 6004-1(b)(iv), the Debtors further state:

a. <u>Sale to Insider</u>.  The Purchaser was until shortly before the Petition Date an insider of the Debtors, within the meaning of section 101(31) of the Bankruptcy Code.[6] The proposed transactions have been negotiated and approved by the Debtors' independent Restructuring Committee of the Board.

b. <u>Agreements with Management</u>.  The Purchaser may seek to enter into customary employment with certain key employees, none of whom is an officer of the Debtors' parent company.

c. <u>Releases</u>.  The Purchase Agreement shall contain a closing condition that Debtors, the DIP Agent, DIP Lender, Prepetition Term Loan Agent and Prepetition Term Loan Lender, and Purchaser shall (1) enter into mutual global releases of claims

---

[6]    For purposes of full disclosure, CWI is a creditor of the Debtors.  Additionally, Mark Bostick is a former director of Comcar and Bostick and CWI collectively own less than 10% of the equity of Comcar.  Also for full disclosure, Bostick was removed as non-employee Chairman of the Board in 2018 and has been in arbitration or litigation with Comcar since shortly after that time.  It is submitted that he is not an insider in the sense of being a person in control of the Debtors, and the LOI was negotiated at arms'-length and in good faith.

except certain claims described in the Letter of Intent, and (2) negotiate satisfactory release provisions with certain parties to permit the Real Estate to be delivered to Purchaser free and clear of all liens and encumbrances (collectively, the "Releases").

d.  Private Sale/No Competitive Bidding and Protections for the Purchaser.  The Purchase Agreement will contain competitive bidding protections for the Purchaser, including a break-up fee should the Debtors exercise their right to a fiduciary out before the Sale Hearing.  The break-up fee for an alternative transaction will be the reimbursement of expenses up to a cap of $150,000 (the "Break-Up Fee") payable only out of the proceeds derived from the consummation of an alternative transaction.  Through this Motion, the Debtors seek approval of such protections.  The proposed sale is subject to the Debtors exercising their fiduciary duties should another higher or otherwise better offer be submitted.

e.  Closing and Other Deadlines.  The closing date will be set forth in the Purchase Agreement.

f.  Good Faith Deposit.  The Purchase Agreement will not require the Purchaser to fund a good faith deposit.

g.  Interim Arrangements with the Purchaser.  The Debtors do not have any interim management or other agreement with the Purchaser, however, the Debtors are parties to certain non-residential real estate leases and an equipment lease, described above.

h.  Use of Proceeds.  To be determined.  All Liens will attach to the proceeds, which will be distributed pursuant to the Sale Order or further order of this Court.

i.  Tax Exemption.  The Debtors are not seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

j.  Record Retention.  The Debtors will retain, or have reasonable access to, all records necessary for the administration of these Chapter 11 Cases.

k.  Sale of Avoidance Actions.  The Debtors are not seeking to sell avoidance actions, but any avoidance actions against the Purchaser and its affiliates shall be released.

l.  Requested Findings as to Successor Liability.  The Debtors are seeking to sell the Acquired Assets free and clear of successor liability claims.

m.  Sale Free and Clear of Unexpired Leases.  The Debtors are not seeking to sell the Premises free and clear of any unexpired leasehold interests or other rights.

n.  Credit Bid.  The Letter of Intent does not contemplate a right to credit bid, except as it may relate to the CWI Equipment Lease aspect of the transactions.

o. <u>Relief from Bankruptcy Rule 6004(h)</u>.  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for the private sale.

23.     The Debtors and the Purchaser will file the Purchase Agreement and ancillary agreements with this Court no later than seven (7) business days prior to the hearing on this Motion, which shall contain all of the material provisions set forth above.  The Purchase Agreement will not contain any provision that is more materially burdensome than the terms of the Letter of Intent.

**C.     The Sale of the Acquired Assets is Appropriate Under Section 363(b)(1) of the Bankruptcy Code.**

24.     Prior to the Petition Date, the Debtors marketed CCC and CTTS Repair for sale. The Debtors are seeking Court approval of the sale of the Acquired Assets including the protections afforded to the Purchaser in the event the Debtors consummate an alternative transaction.

25.     Bankruptcy Code section 363(b) governs transactions outside the ordinary course of business involving property of the debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b).

26.     The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513 (7th Cir. 1991)).

27.     Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice

is provided.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 175–76 (adopting *Lionel* factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated business justification test set forth in *Lionel* and adding the "good faith" requirement).

28.    The Debtors do not have the liquidity to continue to operate the CCC and CTTS Repair businesses beyond the period contemplated by the DIP Approved Budget.  Once debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company."  *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing. *See id.* at 656; *see also In re Promise Healthcare Group, LLC, et al.*, Case No. 18-12491 (CSS) [D.I. 770] (order approving the private sale of the Debtors' certain Louisiana facilities upon the Debtors' showing they properly exercised their business judgment and set forth sound business justifications for pursuing such a private sale, having marketed the private sale and showing that the purchaser was the only bidder for the Louisiana facilities that could close a sale promptly on terms favorable to the Debtors); *In re Celadon Group, Inc., et al.*, Case No. 19-12606 (KBO) [D.I. 417, 418, and 766] (orders approving private sales of the Debtors' nonresidential real property upon the Debtors' showing they properly exercised their business judgment and set forth sound

business justifications for pursuing such private sales, having marketed the private sales and showing that the purchasers were the only bidders that could close a sale promptly on terms favorable to the Debtors).

29.     It is well settled that the sale of assets outside of the ordinary course of business by means of a private sale can, and in appropriate cases should, be approved.  *See, e.g.*, *In re Bakalis,* 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the former Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion… to conduct public or private sales of estate property.") (internal quotations and citations omitted); *In re Dewey & LeBeouf,* Case No. 12-12321 (MG), 2012 WL 5386276, at *6 (Bankr. S.D.N.Y. Nov. 1, 2012) (authorizing private sale of art collection because the debtor established a good business reason to proceed by private sale); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship* (*In re Woodscape Ltd. P'ship*), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale… and there is no requirement that the sale be by public auction."); s*ee also In re Promise Healthcare Group, LLC, et al.*, Case No. 18-12491 (CSS) [D.I. 426, 770, and 778] (orders approving the private sale of the Debtors' Louisiana facilities and their St. Alexius facility outside the ordinary course of business).

30.     The Debtors delegated approval of sale transactions to the Restructuring Committee comprising an independent director.  The Restructuring Committee approved and authorized entry into the Letter of Intent and is expected to approve the Purchase Agreement, which will include the material terms set forth in the Letter of Intent, and to proceed to seek approval as a private sale with the embedded fiduciary out.  Therefore, the Debtors, in their business judgment, and in consultation with Bluejay and their other advisors, believe that the sale of the Acquired Assets to

the Purchaser under the process proposed herein represents the fair market value for the Acquired Assets under the Letter of Intent and under the circumstances of these Chapter 11 Cases. Furthermore, the Debtors believe, given that (a) the Purchaser can consummate the private sale transaction sooner than if the Debtors subjected the Acquired Assets to auction, (b) thus far, no other acceptable expressions of interest or bids have been received, (c) nothing in the Letter of Intent prohibits the Debtors from consummating any alternative transaction that in the Debtors' business judgement will maximize the value of their estates, and (d) it is unlikely an auction will lead to a higher or otherwise better bid for the Acquired Assets. Accordingly, the Debtors respectfully submit that the proposed private sale of the Acquired Assets to the Purchaser should be approved.

**D.     Any Sale Should be Approved Free and Clear of Liens, Interests and Encumbrances.**

31.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest or encumbrance in such property if, among other things:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale");

*Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill.

1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions

applies).

33.    The Debtors will serve notice of the Motion on the Office of the United States

Trustee, counsel to the DIP Lender and the Prepetition Term Loan Lender, counsel for the

Purchaser, counsel to the Prepetition ABL Agent, counsel to the DIP Agent and Prepetition Term

Loan Agent, other parties having expressed an interest in the Acquired Assets, any official

committee professionals when appointed, and applicable taxing authorities.

34.    The Debtors expect to obtain the consent of the DIP Lender and the Prepetition

Term Loan Lender, as well as the consent of CenterState Bank, the holder of a first lien on the

Real Estate, such that section 363(f)(2) will apply.  The Debtors contend that no other party asserts

or holds a valid, perfected lien on the Acquired Assets.  Accordingly, to the extent any party

contends that it holds a valid lien on the Acquired Assets, such lien is subject to bona fide dispute,

and the Debtors may sell the Acquired Assets free and clear of such purported lien, under section

363(f)(4) of the Bankruptcy Code, and adequately protect such asserted lien by having the asserted

lien attach to the proceeds of the sale in the same priority and to the same extent and validity as

such lien attached to the Acquired Assets.  Further, in the event CenterState Bank does not consent,

the Debtors may seek approval of the Motion over its objection and grant adequate protection to

CenterState Bank in equity in other collateral on which it holds a lien or otherwise.  Therefore, the

Debtors request that the private sale be approved free and clear of all encumbrances and interests,

with the proceeds being distributed pursuant to further Court order.

**E.    The Break-Up Fee Should Be Approved.**

35.    Courts have approved competitive bidding protections given to a purchaser under

the "business judgment rule", and such arrangements are presumptively valid provided: (i) the

debtors' decision to agree to a break-up fee is not tainted by bad faith or self-dealing; (ii) the break-up fee does not hamper bidding; and (iii) the amount of the break-up fee is reasonable. *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656-57 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993). Specifically, among other things, such provisions attract or retain a potentially successful offer. *Id.* at 662.

36.     The Break-Up Fee will be reasonable in relation to the size of the proposed sale and under the facts of this transaction and will be no more than the reimbursement of expenses up to $150,000.

37.     Further, the inclusion of the Break-Up Fee in the Purchase Agreement is a critical component to the sale, owing to the considerable effort being expended by the Purchaser to conduct diligence and finalize the sale on a short timeline.

38.     The Break-Up Fee will not hamper any other party's ability to offer a higher or better bid for the Acquired Assets.  Given the size of the Break-Up Fee relative to the total amount of consideration provided for the Acquired Assets, the Break-Up Fee will not be so large as to cause a "chilling effect" on other prospective purchaser's interest in the Acquired Assets.

39.     As the timely sale of the Acquired Assets is necessary to preserve its value, the Break-Up Fee constitutes an actual and necessary cost and expense of preserving Debtors' estates. Accordingly, the Break-Up Fee is appropriate.

**F.     The Sale is Proposed in Good Faith.**

40.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

41.    Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Abbotts Dairies of Penn., Inc.*, 788 F.2d at 147 (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.*), 724 F.2d 52, 55 (7th Cir. 1983)). *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

42.    While the Bankruptcy Code does not define "good faith", some courts have held that a good faith purchaser is one who "purchases the assets for value, in good faith, and without notice of adverse claims." *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988) (quoting *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore, the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).

43.    The private sale has been proposed in good faith. The Letter of Intent was the product of extensive good faith, arms'-length negotiations between the Debtors, on the one hand, and the Purchaser, on the other, and was negotiated with the active involvement of the Debtors' professionals. The Debtors believe and submit that the sale of the Acquired Assets to the Purchaser pursuant to the terms and conditions of the Purchase Agreement is not the product of collusion or bad faith. No evidence suggests that the Letter of Intent is anything but the product of arm's length negotiations between the Debtors, the Purchaser, and their respective professional advisors. In

connection with approval of the proposed private sale, the Debtors request that the Court make a finding that the Purchaser is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

44.    Furthermore, the Debtor are unaware of any circumstances or facts that could be perceived as or that the Purchaser or any other party colluded.

## II.    THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS ARE WARRANTED UNDER SECTION 365 OF THE BANKRUPTCY CODE

### A.    Assumption and Assignment of Certain Executory Contract are Within Debtors' Business Judgment.

45.    Pursuant to the procedures that will be set forth in the Purchase Agreement, the Purchaser will designate certain executory contracts related to the CCC and CTTS Repair Business that the Debtors will be required to assume and assign, along with all obligations thereunder, to the Purchaser.  Section 365 of the Bankruptcy Code provides as follows:

> (a)    Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

46.    Accordingly, section 365 authorizes the proposed assumption of the Assumed Contracts by Debtors.  The assumption of a contract by a debtor is subject to review under the business judgment standard.  *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases").  If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the contracts.  *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *In re Market Square Inn, Inc.*,

978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of [the] issue of assumption or rejection will be a matter of business judgment").

47.    The business judgment rule shields a debtor's management from judicial second-guessing.  *Id.*; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").   Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).   Indeed, when applying the business judgment rule, courts show great deference to a debtor's decision to assume a contract.  *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume an executory contract "should be granted as a matter of course").   Thus, this Court should approve the assumption of the Assumed Contracts, if the Debtors are able to demonstrate a sound business justification for doing so.  *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

48.    As previously noted, the assumption of the Assumed Contracts is required so that they may be assigned to the Purchaser pursuant to the Purchase Agreement.  The Debtors, with the assistance of their advisors, have carefully reviewed the economic benefits of assumption and assignment of the Assumed Contracts and believe that their decision to assume the Assumed Contracts in connection with seeking approval of the Purchase Agreement is within the Debtors' sound business judgment, as the assumption of the Assumed Contracts will permit the

consummation of the private sale, thereby benefiting the Debtors and their estates, while avoiding any further liability under the Assumed Contracts. Accordingly, the Debtors believe that assuming the Assumed Contracts is in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest. The transfer of the federal operating authority, state licenses, and other governmental permits is also requested in order to facilitate ongoing operations and uninterrupted employment of hired personnel.

**B.      The Assumption Procedures**

49.      In connection with the assumption and assignment of the Assumed Contracts, the Debtors propose the following procedures (collectively, the "Assumption Procedures").

a.   Notice of Potential Assumption and Assignment. No later than seven (7) business days prior to the hearing on this Motion, the Debtors shall serve a notice of potential assumption, assignment, or transfer of executory contracts and unexpired leases, substantially in the form attached to this Motion as **Exhibit B** (a "Notice of Potential Assumption"), on all parties to the Assumed Contracts.

b.   Objection Period. Each Notice of Potential Assumption shall provide for the cure amounts the Debtors believe must be paid to cure all monetary defaults outstanding under the applicable Assumed Contracts, and any objections to the assumption and assignment of such Assumed Contracts, including to the cure amount (a "Contract Objection"), will be heard at the hearing on the Motion as noted in each Notice of Potential Assumption, or any subsequent hearing to which the matter may be adjourned.

c.   Objection Procedures. If a contract counterparty files a Contract Objection in a manner consistent with the requirements set forth above, and the Debtors and the contract counterparty are unable to consensually resolve the dispute prior to the hearing on the Motion, the amount to be paid or reserved with respect to such objection will be determined at the hearing.

d.   Notice of Assumption and Assignment. No later than one (1) business day prior to the hearing on the Motion, the Debtors shall serve a notice, substantially in the form attached to this Motion as **Exhibit C** (a "Notice of Assumption and Assignment"), identifying the Assumed Contracts, the executory contracts or unexpired leases that will be assumed and assigned to the Purchaser upon the Closing.

e.   Excluded Contracts. The Purchaser may determine to exclude any executory contract or unexpired lease at any time prior to the hearing on the Motion (or after the hearing to the extent an objection to the assumption and assignment of such

contract or lease or the Cure Amount is sustained by the Court), notwithstanding such executory contract or unexpired lease having been identified in a Notice of Potential Assumption.  The Debtors will notify any non-Debtor party or parties to an excluded contract or lease by written notice as soon as practicable after such determination, which may be after the hearing or the Closing Date.

**C.    The Purchaser can Demonstrate Adequate Assurance of Future Performance.**

50.    Section 365 of the Bankruptcy Code provides that the trustee may assign an executory contract or unexpired lease if (i) such contract or lease is assumed in accordance with the Bankruptcy Code and (ii) adequate assurance of future performance by the assignee is provided.  11 U.S.C. § 365(f)(2).

51.    The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption."  *In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d Cir. 2001); *see Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[A]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

52.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

### III. THE SETTLEMENT EVIDENCED BY THE LETTER OF INTENT SHOULD BE APPROVED UNDER BANKRUPTCY RULE 9019 BECAUSE OF THE ADDITIONAL BENEFITS TO THE DEBTORS DUE TO THE SETTLEMENT FEATURES THAT ARE INTEGRAL TO THE TRANSACTION

53.     Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The overarching consideration in ruling on a settlement is whether the settlement is "fair and equitable" and "in the best interest of the estate." *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). "Settlement agreements are generally favored and, in fact encouraged, in bankruptcy cases, as they provide for often needed and efficient resolutions." *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citing *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)); *cf. In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) (recognizing compromise of disputes as a "practical adjustment").

54.     The decision whether to approve or reject a settlement under Bankruptcy Rule 9019 lies within the sound discretion of the court. *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997); *In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986). To make this determination, a court must assess and balance the value of the claims that are being compromised against the value to the estate of the acceptance of the compromise proposal. *See Martin*, 91 F.3d at 393.

55.     Approval is appropriate where the compromise is fair, reasonable, and in the interest of the estate. *Id*. Courts should not substitute their judgment for that of the debtor, but instead canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re World Health Alts., Inc.*, 344 B.R. at 296 ("The court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude

that the settlement is within the reasonable range of litigation possibilities") (internal citations and quotations omitted); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004); *In re Neshaminy Office Bldg. Assoc.*, 62 B.R. at 803; *In re Penn Cent. Transp. Co.*, 596 F.2d at 1104; *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983).

56.     In *Martin*, the United States Court of Appeals for the Third Circuit gleaned from *TMT Trailer* four factors to guide bankruptcy courts in approving or rejecting settlement agreements: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin,* 91 F.3d at 393; *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *Official Comm. of Unsecured Creditors v. CIT Grp./Bus., Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015); *In re Marvel Entm't Grp.*, *Inc.*, 222 B.R. 243, 250 (D. Del. 1998) (proposed settlement held in best interest of the estate); *cf. In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997) (referring to *Martin* factors as test under "fair and equitable standard").

57.     Application of these criteria does not require a mini-trial or an evidentiary hearing to determine the probable outcome of claims waived in settlement. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Co-op., Inc. (In re Cajun Elec. Power Co-op., Inc.)* 119 F.3d 349, 356 (5th Cir. 1997); *see also Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994).  Instead, a court must gather relevant facts and law to make an informed and objective decision with respect to approving the settlement by balancing the *Martin/TMT Trailer*

*Ferry* factors.  *Id.*  Courts generally give deference to a debtors' business judgement in evaluating settlements.  *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005).

58.     The proposed transaction with the Purchaser has both sale and settlement features, with the settlement terms providing additional consideration to the Debtors for the assets to be transferred.  By agreeing to facilitate the transfer of trailers to the Debtors (conditioned upon the contemporaneous closing of the instant transaction), CWI will remove potential delays and obstacles to the CTL Sale – a sale that will upon closing provide approximately nine million dollars to the estates.  Further, by consenting to the other proposed sales, no potential purchaser need be concerned about Bostick's ROFO rights or his exercise of any rights that could result in an uneven playing field for the purchase of all or any portion of the Debtors' assets.  By settling the arbitration action, the Debtors will avoid incurring additional legal fees and the risk of reversal on appeal and the possible award of damages to Bostick, which damages were asserted to be in excess of $20 million.  Other claims for past-due rent, loans, charges, and similar advances in the approximate amount of $2.93 million will also be released.  The Debtors' potential avoidance action to recover the 2019 Bostick Chairman removal payment, which is disputed by Bostick, will be released as well.

### WAIVER OF BANKRUPTCY RULE 6004(h)

59.     The Debtors respectfully request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).  Timely consummation of the proposed sale is of critical importance to both the Debtors and the Purchaser and is vital to the Debtors' efforts to maximize the value of the Debtors' estates.  Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

**NOTICE**

60.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) applicable Taxing Authorities; (d) counsel to the DIP Lender and the Prepetition Term Loan Lender; (e) counsel for the Purchaser; (f) counsel to the Prepetition ABL Agent; (g) counsel to the DIP Agent and the Prepetition Term Loan Agent; (h) the counterparties to the Assumed Contracts; (i) any official committee of professionals when appointed; (j) counter-parties to the Assumed Contracts; (k) applicable taxing authorities; (l) all parties that expressed interest in any of the Acquired Assets during Bluejay's prepetition marketing of the Acquired Assets, and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that no other or further notice of this Motion is required.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that this Court (i) enter the proposed Sale Order granting the relief requested in this Motion, and (ii) grant such other and further relief as this Court may deem just and proper.

Dated:  May 22, 2020
       Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@us.dlapiper.com

-and-

Jamila Justine Willis (*pro hac vice* admission pending)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
Email:  jamila.willis@us.dlapiper.com

*Proposed Counsel to the Debtors*